Gerald Singleton (WA 59010)
gsingleton@singletonschreiber.com
Stephen J. Hill (WA 7651)
shill@singletonschreiber.com
SINGLETON SCHREIBER, LLP
450 Alaskan Way South, Ste. 200
Seattle, WA 98104
Tel. (509) 517-6620

Meagan Verschueren (CA 313117) *Pro Hac Vice applicant*
mverschueren@singletonschreiber.com
Katie Llamas (CA 303983) *Pro Hac Vice applicant*
kllamas@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
Tel. (619) 771-3473

Attorneys for Plaintiff JANE DOE

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| JANE DOE, an individual,<br><br>     Plaintiff,<br><br>  v.<br><br>G6 HOSPITALITY, L.L.C.; G6 HOSPITALITY IP, L.L.C.; G6 HOSPITALITY PROPERTY, L.L.C.; G6 HOSPITALITY PURCHASING, L.L.C.; G6 HOSPITALITY FRANCHISING, L.L.C.; MOTEL 6 OPERATING L.P.; OLD WEST 6017, LLC; JOHSE LLC; H.S.M. CORPORATION; WYNDHAM HOTEL & RESORTS, INC. and DOES 1-100, inclusive,<br><br>     Defendants. | Case No.:<br><br>Unlimited Jurisdiction<br><br>**COMPLAINT FOR DAMAGES AND INJURIES**<br><br>**JURY TRIAL DEMANDED**<br><br>**Damages in excess of $100,000** |

## COMPLAINT

COMES NOW the Plaintiff JANE DOE, by and through the undersigned counsel, and respectfully submits this Complaint for damages and makes the following averments.

## INTRODUCTION

1.  For decades, sex trafficking ventures have blatantly operated in and out of hotels throughout the United States.

2.  Major hotel brands have made false public claims that "they are combatting human trafficking," but in stark contrast, they continue to direct their hotels to be built and/or branded where they know sex trafficking is most prevalent to profit from trafficker's room rentals and the trafficking crimes that they allow to be perpetrated on their properties. Despite hotels' public statements acknowledging the existential crisis, human trafficking continues to be most prevalent in the hotel and hospitality industry.  Despite their claims, hotel brands and owners, including Studio 6 and Travelodge brands and owners thereof, continue to allow sex trafficking at their properties due to the profits they derive from it.

3.  Criminals parade their misconduct openly on hotel and motel properties throughout the United States, including at thousands of Motel 6, Studio 6 and Travelodge properties, and the hotels and motels profit from providing harbor for the underlying assaults and criminal activity. The hotel and hospitality industry continue to create and expand the environment for traffickers to harbor victims and neglect taking reasonable steps to prevent such criminal misconduct, instead choosing to earn a profit at the expense of human life, human rights, and human dignity.

4.  Public appearances and sponsorships do not excuse corporations and individuals that have financially benefited from sex trafficking. In fact, it reveals corporate knowledge of the use of their properties and technology as hubs for

human trafficking. The hotel industry has historically and presently provided the environment, place, means, and support for the human trafficking industry to become the second largest profitable criminal activity in the United States.[1]

5.      As the trafficking industry grows, so have Defendants and their profits through the expansion of their properties, rooms rented, and goods sold for this explicit and apparent purpose.

6.      JANE DOE files this civil lawsuit seeking compensation for the harm she suffered as a result of being sex trafficked and sold for sex at hotels and motels owned, operated, maintained, managed, regulated, and controlled by Defendants and their agents and employees.

## PARTIES

7.      JANE DOE is a natural person who is currently a resident and citizen of Sequim, County of Clallam, State of Washington. JANE DOE is a survivor of sex trafficking. From 2007 to September 2014, she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants at Defendants' hotel and motel properties.

      a.  Due to the sensitive, private, and potentially retaliatory nature of these allegations, this complaint identifies JANE DOE by pseudonym and general location only. Plaintiff will move the court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Plaintiff's true identity in order to protect Plaintiff and Plaintiff's identity.

---

[1] https://www.mbfpreventioneducation.org/human-trafficking-is-now-the-second-most-profitable-criminal-activity-in-the-united-states/

b. Generally, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved may result in retaliation or harm to the Plaintiff.[3] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

c. In order to maintain her privacy and safety, Plaintiff should not be compelled to disclose her identity. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[4] Plaintiff escaped her traffickers and would be in danger of being forced back into trafficking should her traffickers learn information about her through publicly filed documents in this action. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personally identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identities in a manner that will compromise her personal life, future safety, or employment prospects, as well as her rights to privacy after being a victim of multiple sexual abuses and sexual assaults.

8. Defendant JOHSE, LLC is a for-profit Washington corporation with its principal place of business in Edmonds, Washington. JOHSE, LLC owned and

---

[2] Fed. R. Civ. P. 10(a).
[3] See WA Cases e.g., Doe v. Penzato, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); Roe v. St. Louis
Univ., 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009).
[4] See WASHINGTON cases *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

operated the Travelodge hotel located at 238 Hwy 99, Edmonds, Washington including but not limited to from approximately 2011 to 2013.

9.      Defendant H.S.M. CORPORATION is a for-profit Washington corporation with its principal place of business in Mountlake Terrace, Washington. H.S.M. CORPORATION owned and operated the Travelodge hotel located at 238 Hwy 99, Edmonds, County of Snohomish, State of Washington ("the Travelodge") including but not limited to from approximately 2008 to 2013.

10.     Defendants JOHSE, LLC and H.S.M. CORPORATION shall hereinafter together be referred to as the "Travelodge Owners."

11.     Defendant Wyndham Hotel & Resorts, Inc. ("Wyndham") is a corporation that brands, instructs, controls, and contracts with about 9,000 branded properties for profit, including Travelodge® and specifically the Travelodge Owners and Travelodge where Plaintiff was trafficked for years.  It is a Delaware corporation with its principal place of business in Parsippany, State of New Jersey and can be served through its registered agent in Cincinnati, Ohio.

12.     Wyndham is the successor to Wyndham Worldwide Corporation and is liable under successor liability for the wrongful acts of Wyndham Worldwide Corp., so "Wyndham," as referred to herein, also includes Wyndham Worldwide Corp.

13.     Wyndham shares, and at all relevant times shared, profits with franchisees and directly profited from the room rentals and goods sold for sex trafficking at its branded properties, including the subject Travelodge.  It has known for decades that sex trafficking was occurring at its properties and branded properties, including in Washington and the Travelodge, but did not and has not taken any reasonable action to prevent it at its branded properties, including the subject Travelodge while it was operating up to approximately 2021.

14.     Wyndham owned and/or had an ownership interest in, supervised, managed, controlled, and operated the Travelodge where Plaintiff was trafficked.

15.     Defendant Old West 6017, LLC ("Old West") is a for profit Washington corporation with its principal place of business in Bellevue, Washington. Old West 6017, LLC owns and operates the Studio 6 hotel located at 24035 Van Ry Blvd., Mountlake Terrace, County of Snohomish, State of Washington.

16.     Defendant G6 Hospitality, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

17.     Defendant G6 Hospitality, IP, LLC is a for profit Delaware corporation with its principal place of business in Carrollton, Texas.

18.     Defendant G6 Hospitality Property, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

19.      Defendant G6 Hospitality Purchasing, L.L.C., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

20.     Defendant G6 Hospitality Franchising, L.L.C. is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

21.     Defendant Motel 6 Operating L.P., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

22.     Defendants, G6 Hospitality, L.L.C., G6 Hospitality IP, L.L.C., G6 Hospitality Property, L.L.C., G6 Hospitality Purchasing, L.L.C., G6 Hospitality Franchising, L.L.C. and Motel 6 Operating L.P. will collectively be referred to as "G6 Defendants."

23.     G6 Defendants are registered to do business in the State of Washington and may be served at Cogency Global Inc., 1780 Barnes Blvd., SW, Tumwater, Washington 98512.

24.     Upon information and belief G6 Defendants and its brand Studio 6® properties includes the location at 240 Van Ry Blvd., Mountlake Terrace, County of Snohomish, State of Washington ("the Studio 6"). G6 Defendants created the Studio 6® hotels to be extended stay hotels and added a kitchenette to encourage the same.

This has resulted in traffickers staying for longer periods of time and increased knowledge and notice to G6 Defendants and Old West 6017, LLC of trafficking at their hotels, including but not limited to the subject Studio 6 location and the trafficking of Plaintiff for extended periods of time there.

25.     From 2007 to 2015, G6 Defendants and Wyndham transacted business in Snohomish County, Washington, and purposefully availed itself to Snohomish County, Washington, and the citizens of Snohomish County, Washington, through Motel 6® and Studio 6® and Travelodge, respectively, as well as several other branded properties it controlled.

a.  As hotel operators, G6 Defendants and Wyndham control the training and policies for its branded properties including the Studio 6 and Travelodge and did at all relevant times when they allowed Plaintiff to be trafficked at their properties. Through each of their relationships with the staff at their properties, Travelodge Owners and Old West and the individuals who trafficked Plaintiff JANE DOE at their premises while registered as a guest there, Wyndham and G6 Defendants knowingly benefited or received something of value from its facilitation of and participation in a venture which it knew or should have known had engaged in sex trafficking.

b.  G6 Defendants and Wyndham received a percentage of the gross room revenue from the money generated by the operations of the Motel 6® and the Travelodge®, including a percentage of the revenue generated for the rate charged on the hotel guest rooms in which Plaintiff JANE DOE was sex trafficked.

c.  G6 Defendants is one of the largest hotel brands in the world. G6 Defendants controls, markets, brands, and holds itself out as the owner

and controller of dozens of budget motels under the brand Studio 6® in the state of Washington, including the subject Studio 6 and Old West.

d. Wyndham claims it is "the world's largest and most diverse hotel company, encompassing more than 8,400 hotels across 24 brands in 95 countries."  It boasts about its twenty-five (25) brands—all of which it created, controlled, and sells to the public by and through its franchisees.

e. Wyndham owns several brands, including Travelodge®, and controls, markets, brands, and holds itself out as the owner and controller of each. It has approximately eighty-nine (89) hotels in the State of Washington currently that it profits from.  It has a rewards program and credit card with points through which it sends people to its branded properties, including Travelodge and at all times relevant, the Travelodge.  It allows the public, including traffickers, to book rooms at its branded properties through its website and provides offers and deals online for its properties, including the Travelodge at all times relevant.

f. G6 Defendants and Old West are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Old West subject Studio 6 property where Plaintiff JANE DOE was trafficked for sex. G6 Defendants and Old West each share the common policies and practices complained of herein.

g. Wyndham and Travelodge Owners defendants are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Travelodge property where Plaintiff JANE DOE was trafficked for sex. Wyndham and Travelodge Owners each share the common policies and practices complained of herein.

h. G6 Defendants and Old West Defendants jointly control, employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

i. Wyndham and Travelodge Owners Defendants jointly control, employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

j. As an integrated enterprise and/or joint employer, G6 Defendants and the Old West Defendant are separately and jointly responsible for compliance with all applicable laws.

k. As an integrated enterprise and/or joint employer, Wyndham and the Travelodge Owners Defendants are separately and jointly responsible for compliance with all applicable laws.

l. As an integrated enterprise and/or joint employer, G6 Defendants and the Old West Defendants are jointly and severally liable for any damages caused by employees.

m. As an integrated enterprise and/or joint employer, Wyndham and the Travelodge Owners Defendants are jointly and severally liable for any damages caused by employees.

n. As hotel operators, G6 Defendants and Wyndham control the training and policies for its branded properties including the Studio 6® and Old West defendant and Travelodge Owners defendants respectively, where Plaintiff JANE DOE was trafficked.

o. G6 Defendants represents that it considers guest safety and security important and requires the hotels in its portfolio, which includes the subject Hotel Defendants, to comply with G6 Defendants brand standards and all local, state, and federal laws.

p. Wyndham represents that its "Board of Directors, management team and subject matter experts throughout the Company are actively engaged in the execution of Wyndham's" social strategy, protecting human rights against trafficking, and its policies and procedures regarding the same. Wyndam publicly represents that "[t]hroughout the year, Wyndham actively engages with team members, [and] . . . franchisees . . .." Wyndham conducts regular inspections and gets regular reports about the operations and issues at each of its branded properties, including at all relevant times the Travelodge where Plaintiff was trafficked. Based upon information and belief, Wyndham can and does fine, end a contract, and take other remedial actions if its franchisees do not comply with the standards and rules it sets.

q. G6 Defendants and Wyndham exercises control over its franchisees.

r. At all times relevant in this action, G6 Defendants set up, designed, owned, supervised, controlled and/or operated the Studio 6® location at 24035 Van Ry Blvd., Mountlake Terrace, Washington.

s. Wyndham set up, designed, had an ownership interest in, supervised, managed, controlled, and/or operated the Travelodge that was located at 23825 Hwy 99, Edmonds, Washington.

t. The portion of the street on which Wyndham chose to set up, design, build, brand, operate, control and profit from the Travelodge is and was at all relevant times was the county's epicenter for trafficking and prostitution. G6 Defendants chose to place the Studio 6 near the epicenter just a few blocks away.

26.     Whenever reference is made in this Complaint to any act, deed, or conduct of Old West, the allegation is that Old West engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or

representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Old West and G6 Defendants.

27.     Whenever reference is made in this Complaint to any act, deed, or conduct of the Travelodge Owners, the allegation is that the Travelodge Owners Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Travelodge Owners Defendants and Wyndham.

28.     Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham and the Travelodge Owners defendants.

29.     Whenever reference is made in this Complaint to any act, deed, or conduct of the G6 Defendants, the allegation is that the G6 Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the G6 Defendants and Old West.

## JURSIDCITION AND VENUE

30.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TVPRA").

31.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the

Defendants' misconduct and omissions, led to injuries that occurred in the judicial district where this action is brought.

32.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the County of Snohomish, State of Washington, and all Defendants are registered to do business in the State of Washington.

## SEX TRAFFICKING UNDER FEDERAL LAW

33.     Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[5]

34.     The requirements for liability under the TVPRA on a beneficiary theory can be stated as follows: (1) the person or entity "knowingly benefits, financially or by receiving anything of value" (2) "from participating in a venture" (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

35.     "Sex trafficking" is defined by the TVPRA under 22 U.S.C. § 7102(12) as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

36.     The term "severe forms of trafficking in persons" includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age." 22 U.S.C. § 7102(11).

## FACTUAL ALLEGATIONS

## The Hotel Industry's Role in Sex Trafficking.

---

[5] 18 U.S.C. §1591; 22 U.S.C. § 7102.

37.     While the term "human trafficking" incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.[6]

38.     The hospitality industry plays a crucial role in the sex trade.[7] Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Despite the known risks and known trafficking crimes, Hotels, including the Travelodge and Travelodge Owners as well as the Studio 6 and Old West, offer anonymity and non-traceability to the traffickers, making them ideal venues for crime and sex trafficking in particular.  Hotels, including the subject hotels and owners, knowingly harbor traffickers and those trafficked.

39.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[8] For years, sex traffickers have "been able to reap their profits with little risk when attempting to operate within hotels."[9]

40.     According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.  Traffickers and buyers alike frequently use hotel rooms to exploit victims.

---

[6] Profits and Poverty: The Economics of Forced Labor. May 24, 2014. International Labor Organization. Available at: http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index htm.

[7] Cavagnaro, Giovanna L. C. 2017. Sex Trafficking: The Hospitality Industry's Role and Responsibility. Cornell University School of Hotel Administration. Available at: http://scholarship.sha.cornell.edu/honorstheses/3.

[8] This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us- slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.

[9] See Human Trafficking in the Hotel Industry, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; see also Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

41.     In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.  Hotels have been found to account for over 90% of commercial exploitation of children.

42.     Due to the overall complacency, complicity, and reckless disregard of the hospitality industry on addressing the known issue of sex trafficking, hotels are the venue of choice for sex trafficking.  Traffickers and buyers capitalize on the hotel industry's general refusal to (1) adopt and enforce companywide anti-trafficking policies from the corporate to the property level, (2) train staff on what to look for and how to respond, and/or (3) establish safe and secure reporting mechanisms for those at the point of sale.

43.     Every day, thousands of hotel employees witness red flags and manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur and where it has been known for decades to occur.

44.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when or if they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."

45.     Estimates by attorneys for the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[10] The 2016 Trafficking in Persons Report issued by the United States Department of State

---

[10] U.S. Dep't of State. 2016. 2016 Trafficking in Persons Report, at 387. Available at: https://www.state.gov/documents/organization/258876.pdf.

also confirmed that human trafficking occurs in the hospitality industry in the United States.

46.     The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with certain hotel chains that tend to protect them, including the G6 Hotels and Wyndam Hotels — they know it is unlikely that they will be disturbed.  In fact, Defendants employees and agents operating the Travelodge and the Studio 6 in this case were friendly with Plaintiff's traffickers and showed they knew that Plaintiff's traffickers were trafficking Plaintiff and forcing her to have commercial sex at the subject Travelodge and Studio 6.

47.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.  This started years before Plaintiff was trafficked at Defendants' properties.

48.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Washington Attorney General, Love 146, and EPCAT, among numerous others, have established recommended policies and procedures for recognizing the signs of

sex trafficking.[11]  Most to all of this was known or knowable to Defendants before and at the time Plaintiff was being trafficked at their properties.

49.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of and were aware or should have been aware of at all subject times of the trafficking alleged herein, are specific to the hotel industry. These include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

---

[11] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

- A group of males or females with identical tattoos, scars, or markings in similar locations. This may indicate "branding" by a trafficker;
- A group of females being controlled by one or more males;
- Being controlled by or drug abuse or frequent use of drugs such as GHB, Rohypnol, Ketamine, fentanyl, MDMA (Ecstasy), heroine, Methamphetamines, and Cocaine;
- Possession and presence of excessive sexual paraphernalia such as condoms or lubricant;
- Requesting more towels than an average guest would normally use;
- Condoms, drug paraphernalia, bondage, bloody towels found in rooms or trash;
- Lack of legal identification or fake identification;
- Females with visible signs of injury, past or present;
- Non-guests coming in and out of the room;
- Money exchanged in parking lots or common areas combined with foot traffic in and out of a room;
- Possession or use of multiple cell phones; and
- Possession or use of large amounts of cash or pre-paid cards.

50.     At all times of trafficking alleged herein, G6 Defendants, Wyndham, Travelodge Owners and Old West understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Defendants and each of them knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking and should have seen signs of the sex trafficking of Plaintiff that were observable by Defendants.

51.     Defendants, and each of them, were aware or should have been aware of these signs of sex trafficking when operating, inspecting, monitoring, controlling, and managing their hotel properties, including the subject properties, when

enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

52.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain—here Defendants—to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels, is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

1.     **G6 Defendants knowingly benefit from participation in a venture with Old West and Studio 6.**

53.     Hotel brands, including G6 Defendants, own properties and lend their name and likeness to third party owners, including Old West and other Studio 6 owners, while the building and operations are under the brands' supervision and control through brand standards, franchise agreements, inspections, reports, authority, and otherwise maintaining control over all aspects of operations. In return, the parent brand attempts to exchange the high risk that is inherent in owning an asset like a hotel property for the low risk associated with owning a local property or franchise contract and still profits from filling the rooms and its operations. As such, the hotel and parent brands—here Old West and G6 Defendants –are inextricably intertwined.

54.     The average consumer does not see this relationship and believes what is advertised—that the brand owns, operates, and is responsible for every part of the hotel. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel, they can expect the standards consistent with the parent hotel brand. The parent/brand companies—here, G6 Defendants—hold themselves out to

the public as the owners of the property. The same brand inscribed on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk, advertise that the parent/brand owns and controls the hotel. The brand also controls safety, its reputation, the properties' image, the brand image, the brand standards and rules, and the brand policies and procedures related to minimum safety standards. These brand requirements are contractual with the power to control weighed heavily towards the corporate parent brand.

55.    At all times of trafficking alleged herein and currently, in addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand-wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by the corporate parent brand.[12]  Here, G6 Defendants provided the Old West with the same and the G6 Defendants controlled and had access to the subject bookings and room reservations.

56.    Upon information and belief, at all times of trafficking alleged herein and currently, Old West typically pays around 10% of their total revenue back to the parent hotel brand, the G6 Defendants, and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement and other agreements.

57.    Upon information and belief, per the franchise agreement, the parent brand, G6 Defendants, may enforce its standards through periodic and regular inspections and even termination of the franchise agreement if the franchise hotel is

---

[12] Meyer, Ellen. April 10, 2018. "The Origins and Growth of Franchising in the Hotel Industry." Lodging Magazine.
Available at: https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

found to be inadequate. The right of the parent hotel brand, G6 Defendants, to enforce their brand standards, including safety standards, is also their responsibility.  This was true before and at the time of all trafficking alleged herein.

58.     At all times of trafficking alleged herein, the G6 Defendants dictated franchisee policies related to safety, security, human trafficking, employee training and Franchisee's response, as well as other subjects.

59.     Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject motel passed through a system operated and managed by G6 Defendants.

60.     G6 Defendants own, operate, supervise, control, and/or manage the brand and policies for bookings, rates, and operations, at the Studio 6® and Old West Defendants located near the blade at 24035 Van Ry Blvd., Mountlake Terrace, Washington, where Plaintiff JANE DOE was commercially sex trafficked for nearly two years straight and then off and on at G6 Defendants' owned and operated locations, beginning in 2007 through late 2014. She was noticeably transported, harbored, and forced to be at these locations under physical force and coercion, beaten and threatened, while her body was sold and purchased for commercial sex acts.

61.     G6 Defendants and Old West facilitated the trafficking through its practices, policies, and procedures. G6 Defendants and Studio 6® failed to take appropriate action to prevent the trafficking of individuals, including JANE DOE, for sex so that G6 Defendants and each of its Studio 6®, including Old West's and G6's subject Studio 6, could continue to profit from the room rentals and business that trafficking brings, including business from all over the state, country, and world.

62.     JANE DOE's traffickers rented rooms to imprison and traffic her and others at the subject Studio 6 location so often that employees were friendly,

accommodating and on a first name basis with her trafficker, including a regular employee that worked in the office and held herself out to be in a supervisory or management position. Defendants' agents and employees at the Studio 6 would work with the traffickers to constantly have two rooms available in the back and away from other customers and would keep an eye out for the trafficker regarding the trafficking to protect the trafficker. Defendants put profits before people, including JANE DOE.

63.     G6 Defendants and Old West owned and operated Studio 6 properties including the subject Studio 6, while buyers paraded in and out of rooms rented for the purpose of trafficking Plaintiff. G6 Defendants' and Old Wests' agents and employees observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. G6 Defendants and Hotel Defendants' employees and agents observed and should have observed the trafficking occurring regularly and for multiple days at a time at the subject Motel 6 locations.  Defendants directly know about the trafficking through its agents and employee's relationship with Plaintiff's trafficker.

64.     G6 Defendants and Old West financially benefitted from renting hotel rooms to Plaintiff's traffickers on numerous occasions.

2.     **Wyndham knowingly benefits from participation in a venture with Travelodge, JOHSE LLC and H.S.M. Corporation.**

65.     Hotel brands, including Wyndham, own properties and lend their name and likeness to third party owners, including JOHSE LLC and H.S.M. CORPORATION and other Travelodge franchisees, while the building and operations are under the brands' supervision and control through brand standards, franchise agreements, inspections, reports, authority, and otherwise maintaining control over all aspects of operations. In return, the parent brand attempts to

exchange the high risk that is inherent in owning an asset like a hotel property for the low risk associated with owning a local property or franchise contract and still profits from filling the rooms and its operations. As such, the hotel and parent brands—here the Travelodge Owners defendants and Wyndham –are inextricably intertwined.

66.     The average consumer does not see this relationship and believes what is advertised—that the brand owns, operates, and is responsible for every part of the hotel. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel, they can expect the standards consistent with the parent hotel brand. The parent/brand companies—here, Wyndham or more specifically Travelodge by Wyndham—hold themselves out to the public as the owners of the property. The same brand inscribed on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk, advertise that the parent/brand owns and controls the hotel. The brand also controls safety, its reputation, the properties' image, the brand image, the brand standards and rules, and the brand policies and procedures related to minimum safety standards. These brand requirements are contractual with the power to control weighed heavily towards the corporate parent brand.

67.     At all times of trafficking alleged herein and currently, in addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand-wide central reservation system, 800 number, revenue management tools, world-class loyalty programs, point systems, information and data, and a website. Thus, booking and room

reservations are controlled by the corporate parent brand.[13]  Here, Wyndham provided the other Travelodge Owner Defendants with the same and Wyndham controlled and had access to the subject bookings and room reservations.

68.    Wyndham represents to the public that Travelodge by Wyndham properties have consistently doubled room openings year after year.  It's clear that Wyndam is concerned with profit and not people or people's safety.  Upon information and belief, at all times of trafficking alleged herein and currently, the Travelodge Owner Defendants pays Wyndham a significant percent of their total revenue back and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement and other agreements.

69.    Upon information and belief, per the franchise agreement, the parent brand, Wyndham, may enforce its standards through periodic and regular inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand, Wyndham, to enforce their brand standards, including safety standards, is also their responsibility.  This was true before and at the time of all trafficking alleged herein.

70.    At all times of trafficking alleged herein, Wyndham dictated franchisee and direct local property policies related to safety, security, human trafficking, employee training and Franchisee's response, as well as other subjects.

71.    Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject motel passed through a system operated and managed by Wyndham and was advertised and facilitated by Wyndham.

---

[13] Meyer, Ellen. April 10, 2018. "The Origins and Growth of Franchising in the Hotel Industry." Lodging Magazine.
Available at: https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

72.     Wyndham owns, operates, supervises, controls, and/or manages the brand and policies for bookings, rates, and operations, at the Travelodge® and Travelodge Owner Defendants located near the blade at 23825 Hwy 99, Edmonds, Washington, where Plaintiff JANE DOE was commercially sex trafficked for weeks and days at a time off and on at Wyndham's owned and operated location, beginning in 2009 through late 2014. She was noticeably transported, harbored, and forced to be at these locations under physical force and coercion, beaten and threatened, while her body was sold and purchased for commercial sex acts.

73.     Wyndham and the other Travelodge Owners facilitated the trafficking through its practices, policies, and procedures. Wyndham and Travelodge® including the Travelodge Owners defendants failed to take appropriate action to prevent the trafficking of individuals, including JANE DOE, for sex so that Wyndham and the other Travelodge Owner defendants could continue to profit from the room rentals and business that trafficking brings, including business from all over the state, country, and world.

74.     JANE DOE's traffickers rented rooms to imprison and traffic her and others at the subject Travelodge location so often that the police started tracking and investigating her trafficker while he was trafficking victims there and searched their rooms while the trafficker had Plaintiff away from the hotel more than once. Employees were friendly and accommodating with her trafficker even after the police informed them of the investigation and questioned employees about it. Employees lied and claimed not to know anything and then proceeded to continue to accommodate her trafficker by renting him rooms to traffic Plaintiff.  Defendants' agents and employees at the Travelodge would work with the traffickers to constantly have two rooms and not report or disclose their knowledge of the trafficking to protect the trafficker and profit. Defendants put profits before people, including JANE DOE.

75.     Wyndham and the other Travelodge Owners owned and operated Travelodge properties including the subject Travelodge, while buyers paraded in and out of rooms rented for the purpose of trafficking victims/survivors, including Plaintiff. Wyndham's and Travelodge Owners' agents and employees observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. Defendants Wyndham and Travelodge Owners' employees and agents observed and should have observed the trafficking occurring regularly and for multiple days at a time at the Travelodge.  Defendants directly knew about the trafficking through its agents' and employees' relationship with Plaintiff's trafficker.

76.     Wyndham, JOHSE LLC and H.S.M. CORPORATION financially benefitted from renting hotel rooms to Plaintiff's traffickers on numerous occasions.

**3.      G6 Defendants and Wyndham Knew or Should Have Known that Their Properties—the Studio 6 and the Travelodge-- Were Engaged in Violations of Anti-trafficking Laws.**

**3.1.     Studio 6 and Travelodge Properties are Known to Be Common Sex Trafficking Locations.**

77.     G6 Defendants' and Wyndham's knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. G6 Defendants, Wyndham, Old West, and the Travelodge Owners have known, since well before Plaintiff's trafficking, that sex trafficking was ongoing and widespread at Studio 6 and Travelodge branded properties, including the subject properties named herein.

78.     Use of G6 Defendants' and Wyndham's branded properties for sex trafficking is well known to all Defendants. G6 branded properties and Travelodge hotels are some of the top chains most frequently identified as a site of sex trafficking in federal criminal complaints.

79.    A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that G6 Defendants paid to settle a public nuisance lawsuit related to such trafficking filed by the City of Los Angeles.[14]

80.    G6 Defendants and Wyndham knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 Defendants and Wyndham's brand properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs;" allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms victims were trafficked in without ID; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking or taking any steps to prevent or stop it.

81.    The Los Angeles nuisance settlement required G6 Defendants to change policies that were facilitating sex trafficking.[15] G6 knew from that lawsuit, from many prior lawsuits, and from their personal knowledge about sex trafficking at their properties that their policies were facilitating sex trafficking. Based on information and belief, at all times relevant in this Complaint and currently, G6 Defendants have failed to adequately implement and enforce such changes.

---

[14] Motel 6 pays $250,000 to settle human trafficking suit (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.
[15] *Id.*

82.     Public statements of G6 Defendants confirm that they knew before and during the sex trafficking of Plaintiff that sex trafficking is a problem in the hotel industry, sex trafficking was occurring at their branded hotels, and that they retained control over the response of their branded hotels to this problem. G6 Defendants recognized that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[16] They also acknowledged the significant role G6 Defendant have in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels.[17]

83.     Wyndham also has put out several public statements over the past ten (10) to fifteen (15) years indicating they know that sex trafficking is a problem in the hotel industry and at their hotels and claiming that they will be committed to fight against it.

84.     Defendant Wyndham signed "the Code" several years ago and thereby promised to adopt policies to combat trafficking.[18] Yet, Defendants have failed to implement most, if not all of these policies.

85.     Defendant Wyndham is a face and signor of the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective mandatory Brand standards to be mandated at its branded properties, but it should also have enforced them.  Despite Wyndham's direct and vicarious knowledge of trafficking at

---

[16] G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING,
http://g6propertycollateral.com/wp-
content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf
[17] *Id.*
[18] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

its hotel, it did not create, implement or enforce effective standards to prevent the trafficking it knew its properties were facilitating.

86.    G6 Defendants acknowledge on its website that it controls the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its branded hotels, which was the same at subject Old West's property where Plaintiff was trafficked and abused.[19]

87.    Wyndham has published reports indicating that it controls and implements anti-trafficking policies at its branded hotels and its website directs consumers to information regarding the same.

88.    G6 Defendants claim to take a zero policy against sex trafficking at its Motel 6 Brand locations, but G6 Defendants intentionally ensure its hotels are "strategically located . . . close to airports, freeways, and other thoroughfares" making them attractive venues for trafficking and compelled prostitution.[20]  For years, G6 Defendants have chosen to place their branded properties, including the subject properties, in known trafficking areas/hubs.

89.    Despite reports, police activity and investigation of trafficking at the Travelodge, and direct knowledge of trafficking at the subject Travelodge, it did not change its ways or policies and procedures no matter how many people it hurt over the years.

90.    Wyndam claims in a recent public report that it "continues to work to enhance policies and mandate training for all team members to help them identify and report suspected trafficking activities."  Thus, it knows it is a problem and its other public statements show it knows it has been for years.

---

[19] https://g6hospitality.com/combating-human-trafficking/
[20] Motel 6 – An Iconic American Brand, https://g6hospitality.com/our-brands/#about-motel-six (last visited March 27, 2024).

91.     A recent article entitled "Mountlake Terrace works to clean up crime at Studio 6 hotel" written by Bob Throndsen in 2022 was published and is still publicly available at MyEdmondNews.com.  The article is about the long-term prevalent crime at the subject Studio 6 where Plaintiff was trafficked.  It quotes Mountlake Terrace Police Commander Pat Lowe as saying that crime in and around the 119-room hotel "has been a problem for years."  It states that examples in 2022 alone a woman at the hotel was arrested for assault on another woman; a man was arrested after beating a woman; guns were found in the rooms; major violent drug busts happened; a man went in unlawfully to visit an "ex-girlfriend;" and a woman was overdosing.  The article reports that Police Chief Pete Caw commented that they threatened abatement action against Studio 6 and were working aggressively to get Studio 6 to reduce the crime and increase safety at its hotel. Police command employees, city code enforcement officers and the City Attorney met with Studio 6 regional managers in July 2022 to discuss the safety issues at the hotel.  Studio 6 had a new owner, and the article reports that Studio 6 agreed that the hotel will "require photo identification and credit card information for future room rentals (rather than accepting cash payments without identification)." It reports that Studio 6 Manager, Laura Peckinpaugh said that customers must also pay a security deposit only by credit card and that credit card must be only in the customer's name.  Throndsen claims that Peckinpaugh said "It helps weed out a certain type of clientele and holds people accountable for their actions." He says that Commander Lowe told him that just changing the way guests pay, "would solve probably half the problems" that police have.  All of this was known and knowable to Defendants. Defendants could have changed their policies decades ago but instead chose to profit from traffickers.  Other recent policy changes to avoid abatement included issuing parking permits for guests only.  This could have also been done decades ago had G6 Defendants or Old West wanted to protect their guests, including Plaintiff.

92.    At the time of the trafficking alleged herein and, G6 Defendants and Wyndham policies and procedures provided the means for sex trafficking to harbor victims by providing low-rate rooms, accepting cash as payment, relaxed identification policies and sometimes not requiring any ID, not requiring IDs for persons entering and exiting the hotel, not requiring IDs to match credit cards, not providing adequate security, and providing multiple room keys for a single person.

93.    Upon information and belief, before and at the time Plaintiff was trafficked at the subject Studio 6 and Travelodge properties, each of the local owners and defendants monitored criminal activity occurring at their respective G6 and Travelodge branded hotels and were aware of activity indicating commercial sex, sex trafficking and related crimes occurring at those branded hotels, including the specific hotel properties where Plaintiff was trafficked.

94.    Scores of news stories from across the United States highlight G6 Defendants' and Wyndham's facilitation of sex trafficking and certainly establish that all Defendants knew, or should have known, of the use of Studio 6 and Travelodge hotels, including the subject hotels, for sex trafficking.

95.    Information that has become public through news stories establishes the entrenched and pervasive nature of G6 Defendants' and Wyndham's role in providing a venue where sex trafficking has continued unabated for years. Defendants have provided the means necessary for traffickers to traffic victims, including Plaintiff. Among notable press involving the frequent use of G6 and/or Travelodge hotels for illegal trafficking activity, the following was noted:

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[21]

---

[21] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105

- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[22]

- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[23]

- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[24]

- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[25]

- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[26]

- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[27]

---

[22] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[23] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[24] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

[25] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[26] FBI Investigates Human Trafficking At Madison Hotel, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[27] Suspects Busted in Anaheim Sex Ring, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

- Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[28]

- In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[29]

- Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[30]

- Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[31]

- In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[32]

- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[33]

---

[28] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[29] Amanda Milkovits, Massachusetts Man Accused of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[30] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015)https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[31] Hsing Tseng, Seven Indicted by Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust/.

[32] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

[33] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, Herald Net (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[34]

- In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[35]

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[36]

- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[37]

- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[38]

- In Beaumont, Texas, multiple survivors sued after being trafficked in Motel 6 and Studio 6 locations and claimed the hotel staff ignored their cries for help and obvious signs of trafficking.[39]

96.     Three nearby Motel 6 locations in SeaTac, Washington have been sued by several child and adult trafficking survivors in the past several years related to facilitating and allowing sex trafficking to take place at their locations.  G6

---

[34] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, News Mississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.
[35] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.
[36] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity/.
[37] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.
[38] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.
[39] Local Hotels accused of ignoring signs of sex trafficking, Megan Zapalac (July 28, 2023) https://www.beaumontenterprise.com/news/article/provost-umphrey-law-firm-files-lawsuit-federal-18257757.php

Defendants directly owned and operated those nearby Motel 6 locations during the alleged trafficking.

97.    Travelodge owners and Wyndham has been named in numerous civil lawsuits arising out of sex trafficking at their properties, including during the trafficking of Plaintiff in this case, which put Wyndham on further notice of what was going on.

98.    Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of G6 and Wyndham branded properties owned and/or controlled by G6 Defendants or Wyndham.

99.    In 2011, a Change.org petition was published to address rampant gang-based sex trafficking in Wyndham hotels in California.  The petition argued that from 2006 to 2011, members of the Crips gang in San Diego ran child sex trafficking rings of at least sixteen (16) girls out of various area hotels. Two subject properties on which many instances of child sex trafficking took place were a Howard Johnson in Escondido, California, and a Travelodge in San Diego, California, both owned by the Wyndham group.

100.    Based on information and belief, before and at the time of the sex trafficking of Plaintiff, Defendants managed and monitored on-line reviews their motel/hotel locations throughout the country that complain about prostitution and facts consistent with sex trafficking at their properties.

101.    This sampling of news stories, reviews, and other public information establishes that, at the time Plaintiff JANE DOE was trafficked at the subject properties, the Defendants knew or should have known that:

a.  there was widespread and ongoing sex trafficking occurring at G6, Studio 6, Wyndham, and Travelodge branded properties;

b.  sex trafficking was a brand-wide problem for G6 Defendants and Wyndham;

c.  G6 franchisees and Travelodge franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking and harboring trafficking at the branded hotel properties, including at and/or nearby the subject properties;

d.  G6 Defendants' and Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

e.  G6 Defendants and Wyndham and their franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring and allowed to occur.

102.    Despite this knowledge and mounting evidence that sex trafficking at its properties was ongoing and growing, Defendants chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking. In fact, growth is the forefront of both G6 and Wyndham's strategy as each continue to launch expansion plans and brag publicly about growth. Defendants failed to take responsibility and accountability for their wrongful actions and inaction in knowingly profiting from sex trafficking ventures around the country, including at the subject hotels where Plaintiff was trafficked.  Defendants' failures led to and caused Plaintiff to be trafficked and the horrific injuries and lifelong permanent harm she suffered as a result.

**3.2. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject Studio 6 and Travelodge locations that each owned and/or controlled.**

103.   Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject Studio 6.and/or Travelodge locations for which they owned and/or controlled at all times relevant.

104.   Internet reviews for the subject Studio 6 location named herein, which G6 Defendants and Old West reviewed, read, managed, controlled and monitored, show signs of sex trafficking during and well after Plaintiff was trafficked.

For example:

- 2024 Trip Advisor Review states in part, "this place is sketchy at best and I did not feel comfortable staying there as a single woman" and "there was legitimately a guy on meth in the lobby . . . this is the type of place most sex work and drug activity take place."

- 2023 Trip Advisor Review states in part, "we have silently overlooked the drug den and prostitution issues this place has had . . . the shady people who sit in the lot overnight . . . [and] the unhelpful overnight staff."

- 2009 Trip Advisor Review states in part, "I could hear the couple in the room next to me . . . they were talking very loud . . . I assume they were on drugs . . . I was told by the man on the phone that he was just an answering service and no one would be at the office until 7am . . I felt very uncomfortable as a woman staying at this hotel alone without anyone at the property to deal with guest issues."

105.   Internet reviews for the subject Travelodge location named herein, which Wyndham and the Travelodge Owners reviewed, read, managed, controlled and monitored, show the pervasiveness of drugs and activity consistent with trafficking during and well after Plaintiff was trafficked.

For example:

- 2021 Google Review states in part, "Drunk or drugged people everywhere. Noise all night."

- 2018 Yelp Review states in part, "If you have low standards, don't mind drug paraphernalia, and/or overdoses then this is your place . . . 3 police cars and an ambulance in the parking lot . . .what kind of management ignores nefarious activity that is happening right under their noses."

- A 2017 Google Review states in part, "Twice I did have someone knock on my door late at night looking for someone.  I don't know if that was drug related or hooker related but most likely one of the two. . .."

- 2016 Google Review states in part, "The location of this hotel is good, apparently for the drug dealers and the hookers as well.  I stood outside a number of times to get fresh air, which looked over toward the Subway, watching guests of this hotel make contacts with people, go sit in the persons car for a few minutes and then both walk over to the hotel and go in their rooms. . . I was required to pay a $100 cash deposit."

- 2016 Yelp Review states in part, "Opening up the window to see the view and watch the commotion going on  . . . needles out side in the backyard . . . and walk in to a shouting match with an irate man, woman and the front desk."

- 2014 Yelp Review states in part, "The cons were the strung-out hooker in the parking lot that was just hanging out, the permanent residents and the lingering smoke smell."

- A 2014 Yelp Review states in part, "It appears that people live in some of the rooms. Quite frankly we were VERY uncomfortable with the clientele and surroundings.  When we woke up, there were three police officers questioning someone on our floor."

- A 2013 Yelp Review states in part, "on the second floor, there is a large women trying to keep some shirtless guy from coming into her room, yelling at her that she owes him a dollar! . . . If I had a black light, this room would light up like the surface of the moon!"

106.   Traffickers, including Plaintiff's traffickers, repeatedly chose to use the subject motel locations for their sex trafficking activity. As such, Defendants knew or should have known about the pervasive sex trafficking at the subject locations based on obvious indicators of this activity.

107.   Police and/or "911" calls for service to the subject Studio 6 and Travelodge show that guests called for help several times in the years Plaintiff was trafficked related to assault, battery, domestic violence, men beating women, drug overdose, and prostitution and/or trafficking.

108.   Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the subject Studio 6 and Travelodge locations named herein prior to and during Plaintiff's trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who are not registered guests in and out of their room at unusual times, noticeable signs of commercial sex activity, men waiting in parking lots for long periods of time throughout the night, arriving with few possessions for extended stays, some women entering not being allowed to enter or go freely, signs of abuse and restraint, signs of commercial sex, money exchanged in parking lots and hallways, police activity, long-term guests, men demanding money form women, physical abuse, drug addiction and drug overdoses, and other signs consistent with the "red flags" of trafficking.

109.   Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from

the appearance, demeanor, and restricted movements of these victims, as well as law enforcement investigation and the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation at the subject properties.

110.   All knowledge from the employees, staff, and agents at these subject Studio 6 and Travelodge locations is imputed to all Defendants.  Defendants knew, by and through their employees and agents, about this widespread and ongoing commercial sex by force, fraud or coercion, also known as "sex trafficking," and human trafficking at these locations, including the trafficking of Plaintiff through the direct observations of hotel staff, including management-level staff and inspectors sent by the franchisor, brand and/or parent company.

111.   Upon information and belief, Defendants knew or should have known about the widespread trafficking at the subject Studio 6 and Travelodge locations accordingly based on the locations they owned and/or controlled referenced herein, based on the above and below including but not limited to:

a.     The employees' and agents' witnessing of, by seeing, hearing and being made aware of obvious signs of trafficking including but not limited to men controlling women; commercial sex; drug use and fights surrounding the commercial sex; soliciting commercial sex throughout the hotel and parking lot; women not allowed to come and go freely without escort; numerous different men entering the same hotel room women were escorted to by other men and coming in and out without staying overnight or showing ID; paying for rooms in cash per night without any or without proper ID; women being escorted to rooms rented by men while looking unhealthy, unhappy and/or injured; drug, restraint, and sex paraphernalia, and women and men coming with no luggage or all of their belongings so as to live there;

b.     the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to Defendants;

c.     the regular monitoring of online reviews;

d.     the collection and monitoring of customer surveys and complaints;

e.     the regular inspections of the hotel properties;

f.     information provided by law enforcement; and

g.     other sources of information available to Defendants.

112.   Any reasonable hotel owner and operator would have known illegal trafficking was occurring at the subject properties and what to do to stop it. Yet Defendants chose to do nothing and continued to knowingly benefit from renting rooms to Plaintiff's traffickers harboring her to sell her for sex.

### 3.3.   Defendants Facilitated Plaintiff Being Trafficked at Studio 6 and Travelodge.

113.   Plaintiff was sexually assaulted, abused, hit, beat, nearly killed, and forced to have commercial sex for money and things of value from 2007 to late 2014. Plaintiff is a survivor or human trafficking, sex trafficking, and labor trafficking.

114.   Plaintiff's traffickers trafficked her for long periods of time from 2007 to late 2014 at the subject Studio 6 and Travelodge described herein.

115.   From 2007 to 2009, Plaintiff was trafficked consecutively at the Studio 6. Her trafficker knew the lady that worked most often at the front desk on a first name basis and that employee and/or manager made sure Plaintiff's trafficker always had two rooms in the back away from other guests. One room was for the trafficking and the other was for the trafficker to sleep if he so wished.

116.   From 2007 to late 2014, Plaintiff was forced to have commercial sex with five (5) to ten (10) men per day.

117.    Plaintiff's trafficker physically beat, injured, hit, and physically and mentally abused Plaintiff.  Plaintiff's trafficker threatened to beat and kill Plaintiff and kill people she cared about if she did not comply.  Plaintiff's trafficker did indeed follow through with his threats if she did not comply.  Plaintiff's trafficker would whip her with a leather belt at the subject Studio 6 and she would scream and cry in pain.  No one ever came to help. Sometimes the beatings would last hours. Her trafficker would hit her, and she would often have black eyes and other visible injuries.

118.    When Plaintiff was forced to interact with employees or go to the office, employees did not ask if she was okay or offer any help despite the loud beatings or visible injuries or distress.  Plaintiff's trafficker was always around, and he always had someone watching Plaintiff or he was watching Plaintiff. She knew that employees were friends with her trafficker and looked out for him while being trafficked at the subject Studio 6 from 2007 through September 2024.

119.    While being trafficked at the Studio 6, Plaintiff did try to seek help from the Studio 6 employees at one point, but her trafficker tackled her in the hallway and drug her back to the room kicking and screaming.  Studio 6 employees saw this and did not call the police or do anything to stop it.

120.    While Plaintiff was being trafficked at Studio 6, police would conduct sting operations related to trafficking at the subject Studio 6 and the G6 Defendants' and Old West's employees and agents would warn Plaintiff's trafficker about the sting so that he could leave with Plaintiff and others before the sting. They would leave for the time period of the sting and then her trafficker would bring her right back.

121.    From approximately 2009 through September 2014, Plaintiff was trafficked on and off for varying lengths of time at the Studio 6.  The employees always ignored her distress, the abuse, the beatings, her fear, the control her

trafficker had over her, the loitering of her trafficker while she was forced to have commercial sex, the exchange of money, the men going in and out, the clear conversations between her trafficker and employees that put them on notice of what he was doing related to trafficking, the violence her trafficker inflicted on her and others, the things cleaning staff saw in the rooms used for commercial sex and trafficking, and the Defendants' employees and agents always protected her trafficker and never offered any help to Plaintiff or other persons being noticeably trafficked.

122.    From approximately 2009 to late 2014, Plaintiff was also trafficked on and off for days and weeks at a time at the subject Travelodge.

123.    Plaintiff was consistently hit and beat at the Travelodge by her trafficker and had injuries visible to Travelodge hotel employees and agents that saw her.

124.    On one occasion, Plaintiff's trafficker threw a trafficking victim that was naked out of the hotel room and into the parking lot bush at the Travelodge. This was visible to other guests, cameras and employees.  No one helped her.

125.    On several occasions, Plaintiff's trafficker pounded on her hotel door with his fists and yelled profanity and threats.

126.    On one occasion, Plaintiff's trafficker pounded on the hotel door at the Travelodge where he kept her and when she opened it, he punched her in the head and kept punching her until she was unconscious.  Plaintiff believed she nearly died.  This violent incident was loud and visible to cameras, other guests, and likely employees.

127.    Police came to the Travelodge looking for evidence of trafficking and must have been investigating Plaintiff's trafficking because they asked to view a room Plaintiff and her trafficker were using when he had her out.  Defendants Wyndham's and Travelodge Owners' agents and employees allowed the police into

the room.  Whether they had a warrant is unknown at this time. Wyndham's and Travelodge's agents and employees told Plaintiff and/or her trafficker about the incident and did not kick the trafficker out or "86" him or restrict future use of the hotel by either Plaintiff's trafficker or her.  Instead, they continued to allow him to use the Travelodge rooms for trafficking after that incident and clear notice of trafficking.

128.    While Plaintiff was trafficked at the Studio 6 and Travelodge, the buyers would come to the room without showing ID and park in the parking lots without any type of permits unrestricted.  The trafficker would wait outside the room or in a car watching. The non-guest buyers would come and go and then exchange money in the parking lot or outside of the room with the trafficker and the trafficker would go back into the room.

129.    Plaintiff's trafficker had guns at the Studio 6 and Travelodge while trafficking Plaintiff.

130.    Plaintiff's trafficker physically harmed Plaintiff, threatened Plaintiff's life and those she cared about, and made several false promises to Plaintiff to force her engage in commercial sex for profit to her traffickers, including the Defendants.

131.    Based upon information and belief, the Studio 6 and Travelodge had cameras at all relevant times that would have been able to document and/or record physical violence, threats, loitering, money exchanges, beatings, arguments, foot traffic in and out of the rooms, and other acts consistent with sex trafficking.

132.    At all relevant times, the Studio 6 and the Travelodge allowed, and sometimes required, cash payments and deposits, and did not require credit cards that matched valid Identification Cards.

133.    At all relevant times, Defendants did not always require valid Driver's Licenses or other valid photo identification for guests.

134.   At all relevant times, Defendants did not require people entering the premises to get parking permits.  Defendants did not secure its property. Defendants did not provide any and/or adequate security at the times Plaintiff was trafficked.

135.   At all relevant times, Defendants did not require guest parking permits or check vehicle registrations.

136.   At all relevant times, Defendants had security cameras.

137.   At all relevant times, Defendants knew that human trafficking, including sex trafficking, was occurring at their properties, including but not limited to their subject properties where Plaintiff was trafficked and the trafficking of Plaintiff, and allowed and knowingly facilitated the trafficking for profit.

### 3.4.   Defendants knew JANE DOE was trafficked at their properties—the Studio 6 and the Travelodge.

138.   During the period that Plaintiff was trafficked at the subject Studio 6 and Travelodge locations named herein, there were obvious signs that her traffickers were engaged in sex trafficking: According to County Sheriff's Office records, deputies have been called to the motels several times for area checks and 911 calls. Several of those calls were for prostitution-related crimes.

139.   The manager/front desk employees of the Studio and the Travelodge, had ongoing business relationships with Plaintiff's traffickers, would have conversations about the trafficking, and would put them in specific rooms and warn them about County Vice stings and other police activity.

140.   The subject motels accepted cash from her traffickers for the rooms.

141.   Other girls were trafficked at the same hotels at the same time as Plaintiff and Plaintiff observed it while other employees were nearby and observing.  Employees observed Plaintiff being abused and witnessed the men coming in and out of the rooms and the exchanges of money with the trafficker.

142.    Several red flags commonly associated with human trafficking were taking place while Plaintiff was being trafficked in plain sight of Defendants' employees and/or agents.

143.    There was heavy foot traffic in and out of the Traffickers' rooms where Defendants were harboring Plaintiff involving men who were not hotel guests. Several men came in and out of the hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the hotel without showing IDs or needing any permits whatsoever to have their vehicles there. Their coming and going was visible to hotel employees that were located at front desks and around the property.  It was visible to security cameras.  A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it by and through their employees and agents.

144.    There were other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel, such as condoms, sex paraphernalia, and lingerie.  These things were not only visible to but must have been seen by hotel employees entering and cleaning the rooms.

145.    When forced and coerced into coming and going from the subject Studio 6 and Travelodge locations, Plaintiff looked unhealthy, unhappy and abused.  Her trafficker was always watching her, and her noticeable demeanor was visible to hotel employees that she passed.

146.    Based upon information and belief, multiple employees and/or agents at the subject Studio 6 and Travelodge locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment with the Defendants.

147.   As such, Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at their subject properties.

148.   Given these obvious signs, Defendants knew or should have known about the trafficking and harboring of Plaintiff based on their policies and/or protocols that required hotel staff to report all suspected criminal activity including trafficking and sex trafficking.  They also would have known based on their policies related to inspections.

### 4.   Defendants facilitated the trafficking of Plaintiff.

149.   Defendants had both actual and constructive knowledge of the trafficking of Plaintiff at the Studio 6 and Travelodge locations they owned and operated because the trafficking was the direct result of Defendants', by and through they employees and agents, facilitating her trafficking at the subject locations.

150.   The Brand Defendants are responsible for the acts, omissions, and knowledge of all employees of the subject Studio 6 and Travelodge locations that each contracted with and controlled, as well as the other owners including the Travelodge Owners and Old West, when operating the hotel because these acts and omissions were committed in the course and scope of employment. Defendants ratified these acts and omissions because Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known and reported to Defendants of sex trafficking occurring at the subject Studio 6 and Travelodge branded locations.

151.   Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations, Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including Plaintiff.

152.    Defendants knew that Plaintiff was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to harbor and facilitate Plaintiff's sexual exploitation.

153.    Defendants also facilitated widespread trafficking at their Studio 6 and Travelodge locations, including the trafficking of Plaintiff in ways including:

a.      allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b.      inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c.      choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures; and

d.      implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**5.    Brand Defendants facilitated the trafficking of Plaintiff at the Studio 6 and Travelodge Branded Properties**

154.    Upon information and belief, during the times Plaintiff was trafficked at the subject properties, G6 Defendants and Wyndham participated directly in aspects of the operation of those subject Studio 6 and Travelodge, respectively, that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff as follows:

a.      G6 publicly assumed responsibility and control over the human trafficking response of all Motel 6 properties, including design and implementation

of practices to prevent trafficking, safety and security procedures, employee, and franchisee education, training, and response, partnership with external organizations, and advocacy;

     b.     G6 retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels;

     c.     G6 retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the G6.

     d.     G6 determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

     e.     G6 retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

     f.     G6 expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

     g.     G6 retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking.

     h.     G6 determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

     i.     G6 acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

     j.     G6 maintains a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential

criminal incidents at all Motel 6 properties, including suspected trafficking incidents;

k.      G6 is responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Motel 6 locations;

l.      G6 maintained control over all details of the terms under which franchised hotels, including the subject Motel 6 locations, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data.

m.      G6 dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Motel 6 locations;

n.      G6 retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the subject Motel 6 locations, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

o.      G6 collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Motel 6 locations, including trends that would reveal patterns consistent with human trafficking.

p.      G6 retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

q.      Wyndham expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to crime and overall criminal conditions including human trafficking;

r.      Wyndham retained control, at the brand-wide level, over training of franchisees and all employees running its branded properties on how to spot the signs of and help prevent human trafficking.

s.      Wyndham determined whether the training is provided to its employees, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

t.      Wyndham acknowledges that they retain control to adopt requirements for franchised hotels specifically designed to prevent unsafe premises including human trafficking and other criminal activity;

u.      Wyndham represents publicly that it has a team of people working on social issues, including human trafficking, to prevent it at its properties.

155.   At the times Plaintiff was trafficked and since, G6 Defendants and Wyndham directly participated in and retained day-to-day control over renting rooms at the subject hotel locations by, among other things:

a.      controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes, along with website control;

b.      directly making reservations for rooms at the subject locations and accepted payment for those rooms through a central reservation system that they controlled and operated. G6 and Wyndham could reserve rooms and accept payments without requiring franchisee approval or involvement;

c.      establishing and maintaining control over brand-wide "do not rent" or similar systems. G6 and Wyndham set all policies related to use of these types of systems and dictated the day-to-day details of reservations at the subject locations through detailed policies that they established regarding use of their systems;

d.      G6 and Wyndham controlled room rates, required discounts, mandatory fees, and rewards programs;

e.      G6 and Wyndham controlled and restricted the ability of franchisees and staff to refuse or cancel a reservation;

f.      G6 and Wyndham controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g.      G6 and Wyndham had the authority to and could have required certain forms of identification and payment, age verification for guests and/or guardian documentation, along with permits for parking and vehicle registration verification.

h.      G6 and Wyndham had the authority to and could have required certain security and safety measures be followed at all times.

i.      G6 and Wyndham collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject locations for each of their branded properties;

j.      G6 and Wyndham established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject locations until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

k.      G6 and Wyndham required franchisees to use their property management system, which was owned, maintained, controlled, and operated by G6 and Wyndham for virtually all aspects of hotel operations regarding room reservations and payment.

156.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations named herein, G6 and Wyndham Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Plaintiff.

157.    G6 Defendants and Wyndham knew or should have known that Plaintiff was being trafficked and, despite this, benefited from continued association with the other Defendants associated with each of their branded motels and/or her traffickers by providing them hotel rooms and related services to facilitate Plaintiff's sexual exploitation.

158.    Upon information and belief, at all times relevant, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Studio 6 and Travelodge locations, G6 Defendants and Wyndham continued participating in a venture at these hotels, with the other associated Defendants and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a.    adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

b.    provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c.    adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at its branded properties;

d.    implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e.    continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the subject locations;

f.    attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

g.    despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the subject locations, G6 Defendants and Wyndham declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

h.    G6 and Wyndham willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner, and instead focused on trying to create contracts that would limit their liability while still maintaining control.

i.    G6 and Wyndham allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j.    G6 and Wyndham provided traffickers with access to internet services in a manner that G6 knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

159.    If G6 Defendants and Wyndham had exercised reasonable diligence when operating their properties and, in the areas, where it retained control, G6 and Wyndham would have prevented the subject locations from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Plaintiff.

160.    Instead, G6 Defendants and Wyndham engaged in the course of conduct that affirmatively ratified and facilitated widespread and ongoing sex trafficking, including the trafficking of Plaintiff.

161.    Through the conduct described above, G6 Defendants and Wyndham knowingly benefited from engaging in a venture at the subject locations named herein, as follows:

a.      including increased revenue, every time a room was rented at any Studio 6 or Travelodge location;

b.      continuing to rent rooms to Plaintiff's traffickers despite having actual and constructive knowledge of their sex trafficking activity;

c.      maintaining a mutually beneficial relationship with the traffickers at the subject locations, fueled by sexual exploitation of victims, including Plaintiff;

d.      sex traffickers, including Plaintiff's traffickers, frequently used the subject locations for their trafficking because of an implicit understanding that the locations were an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Defendants facilitating that trafficking and warning traffickers about police activity as described throughout this Complaint. This resulted in benefits, including increased and consistent revenue, for Defendants;

e.      Defendants participated in this venture through the conduct described herein as they were jointly responsible for relevant aspects of hotel operations.

162.    Plaintiff's trafficking at the subject Motel 6 locations was a result of Defendants participation in a venture with each other and criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Plaintiff's trafficking at the subject Studio 6 or Travelodge locations.

163.    Defendants also knowingly benefited from engaging in a commercial venture with each other Defendant operating the subject respective locations.

164.   This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of hotel staff and the widespread sex trafficking at the subject Motel and Studio 6 locations named herein.

165.   Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), G6 participated in the venture by continuing to associate with the hotel staff and with other Defendants to operate the Studio 6 and/or Travelodge locations named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Plaintiff.

**6.     Travelodge Owners and Old West Defendants and the Staff at the Travelodge and Studio 6 Locations Named Herein Acted as Actual Agents of their Parent Brands, Wyndham or G6 Defendants.**

166.   G6 Defendants and Wyndham are vicariously liable for the acts, omissions, and knowledge of its employees and selves, as well as their franchisees named herein, and their staff, employees and agents at the Studio 6 or Travelodge locations named herein, which are their actual agents or subagents.

167.   G6 Defendants subjected Old West to detailed standards and requirements regarding the operation of the Studio 6 location named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the G6 Defendants.

168.   Wyndham subjected the Travelodge Owners to detailed standards and requirements regarding the operation of the Travelodge location named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by Wyndham.

169.   G6 Defendants and Wyndham obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that G6 Defendants and Wyndham imposed on their franchisees includes but is not limited to:

a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Defendants used at the subject locations;

b.  covered virtually all aspects of hotel operations, including internal operating functions;

c.  dictated the specific manner in which Defendants and hotel staff must carry out most day-to-day functions at the subject locations; and

d.  significantly exceeded what was necessary for G6 Defendants or Wyndham to protect its registered trademarks.

170.   In addition to the ways described above, upon information and belief, at all times relevant, G6 Defendants and Wyndham exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of the subject motel locations named herein, including the following ways:

a.  required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for it to protect their registered trademarks;

b.  provided training for hotel management and select hotel staff;

c.  required all hotel staff to participate in training it created through an online learning platform and/or chosen curriculum it controlled and maintained;

d. controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that franchisees were required to purchase to operate the subject locations named herein, G6 and Wyndham designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g. required franchisees to sign a technology agreement governing the terms under which franchisees must procure and use technical services and software while operating the subject locations named herein. Franchisees were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. set required staffing levels and/or standards for the locations named herein;

i. established detailed job descriptions for all positions in its properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. set requirements for the hiring process used by franchisees and oversaw employee discipline processes;

k. provided benefits for employees of franchised hotels;

l. required franchisees of the subject properties to use a customer resource management program maintained and operated by the parent company, whether G6 or Wyndham;

m. controlled channels for guests to report complaints or provide feedback regarding the subject locations and directly participated in the response and/or supervised the response to customer complaints or other feedback.

n. retained the right to provide refunds or other compensation to guests and to require franchisees to pay associated costs;

n. generated reports and analysis of guest complaints and online reviews for the subject motel locations;

o. required franchisee Defendants to use a Guest Relations Application and/or something similar owned, operated, and maintained by G6/Wyndham to manage all guest data and information. G6 could use the backend of this system to analyze data and generate reports. Wyndham could run similar reports;

p. set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisees and to bill franchisees directly for that insurance if it determined that the franchisees have not purchased adequate insurance;

q. regularly audited the books and records of franchisee Defendants;

r. conducted frequent and unscheduled inspections of the subject properties;

s. retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of its detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject locations named herein;

t. controlled all marketing for subject locations and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the G6 Defendants or Wyndham;

u. imposed detailed recordkeeping and reporting requirements on franchisee defendants regarding virtually all aspects of hotel operations;

v. supervised and controlled day-to-day operations of the subject locations named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Defendants to use; and

w. retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

## 7.   G6 Defendants are jointly responsible for the trafficking of Plaintiff.

171.   G6 Defendants were participants in a joint venture with each other, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

172.   Upon information and belief, operation of the subject Studio 6 was part of a single unified operation by G6 Defendants. Upon information and belief, G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, G6 Defendants acted jointly to own, operate, control, manage, and supervise the subject Studio 6. As an integrated enterprise and/or joint venture, Defendants were separately and jointly responsible for compliance with all applicable laws.

## 8.   Defendants are Jointly and Severally Liable for Plaintiff's Damages.

173.   The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Plaintiff.

174.   Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Plaintiff for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## <u>CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>

### Sex Trafficking under 18 U.S.C. § 1595

**1.      Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a)**

175.    Plaintiff realleges and incorporates the allegations in paragraphs 1 through 174.

176.    Plaintiff is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

177.    Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

a.      violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals, including Plaintiff, knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b.      violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

178.    Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages as a direct and proximate result of being trafficked and sexually exploited at the Defendants' hotel properties.

2.      **Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

179.   Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 174, and 175 through 178.

180.   Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

181.   Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other and traffickers, including Plaintiff's traffickers, despite the fact that each defendant knew or should have known that these traffickers were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) at Defendants' properties, including the subject Studio 6 and Travelodge locations alleged in this Complaint. As more specifically alleged above, Defendants took part in a common undertaking and enterprise involving risk and potential profits, and here, actual profits resulted.  Defendants' employees and agents had a direct association with the traffickers and knowingly facilitated the traffickers, which, as shown more thoroughly in the incorporated allegations above, showed a continuous business relationship between the trafficker and Defendants such that the pattern of conduct appears to be a tacit agreement between them. Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

182.   Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with Old West Defendant regarding the operations of its respective hotel properties even

though G6 Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

183.   Through the acts and omissions described throughout this Complaint, Wyndham received a financial benefit from participating in a venture with Travelodge Owners Defendants regarding the operations of its respective hotel properties even though Wyndham knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

184.   Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**3.      Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants and Wyndham).**

185.   Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 174, and 175 through 178, and 179 through 184.

186.   Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

187.   Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

188.   Old West acted as the actual agents of G6 Defendants when operating its respective hotel property and in committing the wrongful acts and inactions alleged herein.

189.   Travelodge Owners defendants acted as the actual agents of Wyndham Defendants when operating its respective hotel property and in committing the wrongful acts and inactions alleged herein.

190.    Through the wrongful acts and omissions described throughout this Complaint, G6 Defendants and Wyndham exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees to operate its respective hotel property.

191.    G6 Defendants and Wyndham are vicariously liable for the TVPRA violations of its franchisees, Old West and Travelodge Owners, and the subagents of such franchisees.

192.    Additionally, on information and belief, each of the G6 Defendants participated in a joint venture operating the subject Studio 6 location. They had highly integrated operations at the motel, shared revenue and profits generated from the motel, and exercised mutual control over the venture at the motel. They functioned as a single integrated entity and/or as alter-egos of one another and are therefore each directly and proximately liable for the harms and damages caused to Plaintiff as a result.

## JOINT AND SEVERAL LIABILITY

193.    "Joint and several liability 'applies when there has been a judgment against multiple defendants.'"[40] If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount.[41]

194.    Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.[42]

---

[40] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).
[41] See 735 ILCS 5/2-1117; see Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).
[42] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

195.   Plaintiff alleges Defendants, and each of them, should be held joint and severally liable to her for the totality of her injuries and damages alleged herein.

## **DAMAGES**

196.   Defendants' wrongful acts and omissions described above, individually and collectively, proximately and legally caused Plaintiff to sustain legal damages.

197.   Plaintiff did suffer the following injuries as a direct and proximate result of Defendants', and each of their, wrongful actions and inactions alleged herein, and as such Plaintiff is entitled to be compensated for past and future personal injuries, non-economic damages, and economic damages, see, e.g., 18 U.S.C. §§ 1593, 1595, including:

a.    actual damages;

b.    direct damages;

c.    incidental and consequential damages;

d.    lost earnings and lost earning capacity;

e.    necessary medical expenses;

f.    life care expenses;

g.    physical pain and suffering;

h.    physical impairment;

i.    mental anguish and emotional distress damages (until trial and in the future);

j.    restitution;

k.    unjust enrichment; and

l.    disgorgement of profits.

m.    plaintiff is entitled to pre- and post-judgment interest at the maximum legal rates.

n.     a constructive trust should be imposed on Backpage and Salesforce and the Court should sequester any benefits or money wrongfully received by Backpage and Salesforce for the benefit of Plaintiff.

### PUNITIVE DAMAGES

198.    Plaintiff is entitled to punitive damages under the applicable statutes against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying Plaintiff's claims. See *Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011).

### ATTORNEY FEES

199.    Plaintiff is entitled to recover her costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. See 18 U.S.C. § 1595(a).

200.    All conditions precedent to Plaintiff's recovery of its costs and attorneys' fees have occurred or will occur prior to entry of judgment in this suit.

### JURY DEMAND

201.    Plaintiff requests a jury trial in this action.

### PRAYER

202.    For these reasons, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for:

a.    all economic damages to which she is entitled;

b.    all actual damages to which she is entitled;

c.    all incidental and consequential damages to which she is entitled;

d.    all mental anguish and emotional distress damages to which she is entitled;

e.    all restitution damages to which she is entitled;

f.     all disgorgement of profits to which she is entitled;

g.     all unjust enrichment damages to which she is entitled;

h.     exemplary, treble, and/or punitive damages;

i.     attorneys' fees and costs of suit;

j.     pre-judgment and post-judgment interest at the highest rate allowed

by law; and

k.     all other relief to which she is entitled in law or in equity.

SINGLETON SCHREIBER, LLP

Dated: August 13, 2024       By: _____

Gerald Singleton
Stephen J. Hill
Meagan Verschueren (CA 31311) Pro
Hac Vice applicant
Katie Llamas (CA 303983) Pro Hac Vice
applicant
Attorneys for Plaintiff